UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
ELIZABETH TYREE,                        )
                                        )
                    Plaintiff,          )
                                        )
        v.                              )        C.A. No. 12-11605-RWZ
                                        )
RAY H. LAHOOD, *Secretary,*             )
*U.S. Department of Transportation*,    )
                                        )
                    Defendant.          )
_____ )

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The pro se Plaintiff alleges that she was discriminated against based on her race (African-American), gender (female), and national origin (Hispanic), in violation of Title VII. For the reasons stated herein, the Defendant is entitled to summary judgment.

## PROCEDURAL HISTORY

Plaintiff filed her original complaint in August 2012. She alleged three claims: (a) that the Volpe National Transportation Systems Center ("Volpe Center") terminated her employment on account of her race, gender, and/or national origin; (b) that the Volpe Center failed to pursue a Cooperative Research and Development Agreement ("CRADA") with Worcester Polytechnic Institute ("WPI"), where Plaintiff was a graduate student, on account of Plaintiff's race, gender, and/or national origin; and (c) that Dr. Michael Geyer of the Volpe Center withheld a reference letter in retaliation for Plaintiff's filing an administrative complaint of discrimination.

On April 29, 2013, this Court granted Defendant's motion to dismiss the first and third claims. DN 32 at 7, 11. The Court declined to dismiss the CRADA claim. Id. at 9.

On May 13, 2013, Plaintiff filed a motion to amend her complaint by adding a claim that

she participated in a post-employment training program, and that the Volpe Center terminated the program because of Plaintiff's race, gender, and/or national origin.  DN 34.  On December 13, 2013, the Court granted Plaintiff's motion to amend.  DN 55.  Defendant has answered the amended complaint.  DN 57.

Thus, there are two pending claims:  the CRADA claim and the training program claim. As explained below, the Defendant is entitled to summary judgment on both claims.

## FACTS

### 1. Plaintiff's Two-Year Internship at the Volpe Center

On February 17, 2009, Plaintiff, an engineer,[1] began a two-year internship at the Volpe Center in Cambridge, Massachusetts.  Def.'s Statement of Undisputed Facts ("SUMF"), ¶¶ 3, 11. The Volpe Center is part of the Research and Innovative Technology Administration ("RITA") within the U.S. Department of Transportation.  Id. ¶ 4.  Plaintiff's internship was part of the Federal Career Internship Program.  Id. ¶ 5.

Plaintiff worked with Dr. Geyer (white male) and Dr. Frank Wang (Asian male), both of whom specialize in aircraft wake turbulence.  Id. ¶ 12.  Dr. Geyer was the manager of the wake program at the Volpe Center, and Dr. Wang was the team lead.  Id.  Dr. Wang's team consisted of about ten physicists, statisticians, and engineers, including Plaintiff.  Id.  As one of her job duties, Plaintiff performed aircraft wake turbulence research.  Id. ¶ 13.  In exchange for her work, Plaintiff received an annual salary of $59,000 plus employment benefits such as health and dental insurance plus paid vacation days, sick days, and holidays.  Id. ¶ 14.

While working at the Volpe Center, Plaintiff was also a master's student in physics at WPI.  Id. ¶¶ 2-3.  Her advisor was WPI physics professor Germano Iannacchione.  Id. ¶ 2. Plaintiff had completed the coursework for her master's degree but had not yet performed the

---

[1] Plaintiff graduated from BU with a bachelor's degree in mechanical engineering in 2002.  SUMF ¶ 1.

research for, or written, her master's thesis. Id. ¶ 7. She came up with an idea for her thesis while employed at the Volpe Center. Id. ¶ 16. Specifically, she decided to use non-public wake data collected by the Volpe Center to research and write a thesis on the difference between turbulence in aircraft wakes over water compared to turbulence in aircraft wakes over land. Id. Plaintiff gave a copy of her master's thesis abstract to both Drs. Geyer and Wang. Id. ¶ 17. Dr. Geyer was listed on the abstract as her Volpe Center advisor and Dr. Wang was listed as her Volpe Center technical contact. Id. Plaintiff began the research on, and began writing, her master's thesis while employed at the Volpe Center. Id.

Plaintiff understood that her internship was for two years only, and that employment past the two-year mark was not guaranteed. Id. ¶ 10. Plaintiff's employment at the Volpe Center ended after two years, on February 11, 2011. Id. ¶ 18.

### 2. Discussions About a Possible CRADA Between the Volpe Center and WPI

Shortly before her internship ended, Plaintiff asked Dr. Geyer whether she would lose not only her employment but also her master's thesis research "because it's wrapped up with my employment," and "without it, I've lost my education." Id. ¶ 19. Dr. Geyer said no, the Volpe Center could enter into a CRADA. Id. ¶ 20.

A CRADA is "any agreement between one or more Federal laboratories and one or more non-Federal parties under which the Government, through its laboratories, provides personnel, services, facilities, equipment, intellectual property, or other resources with or without reimbursement (but not funds to non-Federal parties) and the non-Federal parties provide funds, personnel, services, facilities, equipment, intellectual property, or other resources toward the conduct of specified research or development efforts which are consistent with the missions of the laboratory." 15 U.S.C. § 3710a(d)(1). The non-federal signatory to a CRADA is known as a collaborator. SUMF, ¶ 21. Between January 1, 2007 and July 1, 2013, the Volpe Center entered

into only two CRADAs, one with MIT and the other with a company called Rockwell Collins.  Id. ¶ 68.  Preparation of the draft statement of work ("SOW") for the MIT CRADA took more than three years.  Id. ¶ 69.  Preparation of the draft SOW for the Rockwell Collins CRADA took six months.  Id. ¶ 70.

On February 10, 2011, the day before Plaintiff's employment ended, she and Dr. Geyer and Dr. Wang met with a Volpe Center attorney named Felecia McBride (African-American woman) to discuss the possibility of a CRADA.  Id. ¶ 22.  Ms. McBride explained that a CRADA is a contract between a federal laboratory and a non-federal entity under which the non-federal entity provides the federal lab with funds, personnel, services, facilities, intellectual property, or some other type of resource, and, in exchange, the two entities work together on some kind of mutually beneficial research and development project.  Id.  Ms. McBride explained that the potential CRADA would be between the Volpe Center and WPI.  Id.

Ms. McBride explained that, once she was given a draft SOW, she could begin writing the proposed CRADA.  Id. ¶ 23.  Then, after she drafted it, she would "float it up the food chain into the different departments it needs to go to for approval."  Id.  Ms. McBride said that it would likely take her around three months to do her part after receiving a draft SOW.  Id.

Plaintiff understood that a CRADA manager at WPI had to be identified, that that person had to formally approve and sign the CRADA, and that WPI's Legal Department might make changes to the proposed CRADA.  Id. ¶ 24.  However, Plaintiff never gave Ms. McBride the name of a WPI representative who could serve as the CRADA manager.  Id.  Plaintiff also understood that the potential CRADA had to go through a lot of channels within the Volpe Center, and then be approved first by the Director of the Volpe Center, and second by the Administrator of RITA, who she understood was located in either Washington, D.C. or Oklahoma.  Id. ¶ 25.  In short, Plaintiff understood that the CRADA was a possibility, not a guarantee.  Id. ¶ 26.

After the meeting, Ms. McBride emailed Plaintiff a sample CRADA.  Id. ¶ 27.  She wished

Plaintiff "good luck with your discussion with the possible collaborator," i.e., WPI.  Id.

From Plaintiff's perspective, the purpose of the potential CRADA was to enable her to

continue her master's thesis research by using non-public data collected by the Volpe Center.  Id.

¶ 28.  She understood the potential CRADA to relate to her education.  Id.  She testified that, with

the CRADA, "I would have gotten my thesis and I would have been able to graduate."  Id.  She

did not understand the potential CRADA to be an employment benefit.  Id.  Had the CRADA been

written and approved, Plaintiff would not have been paid a salary or received any employment

benefits such as health insurance or paid vacation.  Id.

### 3.  Discussions Between Plaintiff and Dr. Wang Over the Draft SOW

The first step in the CRADA process was for Plaintiff and Dr. Wang to prepare a draft

SOW.  Id. ¶ 29.  Once Dr. Wang approved the draft SOW, he would give it to Ms. McBride, who

could then begin drafting the CRADA.  Id.

On February 11, 2011, Plaintiff's last day of employment at the Volpe Center, she emailed

Dr. Wang:  "As we discussed yesterday, I will write the first draft of the [SOW] for the

CRADA."  Id. ¶ 30.  On February 16, 2011, Plaintiff emailed Dr. Wang her first draft of the SOW,

a 2½ page Word file.  Id. ¶ 31.

On February 24, 2011, Plaintiff emailed Dr. Wang, asking when she should expect his

edits.  Id. ¶ 32.  Dr. Wang replied the same day, copying Ms. McBride:  "[A]ssuming the answer

from the sponsor is that they support the CRADA, then I think we will talk to [Ms. McBride] and

go over the SoW.… [I] am not completely sure if the format and scope and the level of details are

on the right track for the draft you had sent…."  Id.  The "sponsor" was Steve Lang from the

FAA.  Id.

On March 4, 2011, Dr. Wang emailed Plaintiff: "Steve Lang approved the idea of the CRADA. I am not ready to discuss time lines yet since we are still in the data collection and processing mode, and there are a number of action items assigned. So I will attend to those direct action items first, but this is just a quick note to let you know of the status. …" Id. ¶ 33.

On March 7, 2011, Plaintiff replied: "That's great news! Thanks!" Id. ¶ 34.

On April 1, 2011, Plaintiff went to the Volpe Center and spoke with Dr. Wang. Id. ¶ 35. He told her, "Don't wait until the [SOW] and the CRADA are finalized. Just do your research." Id. Plaintiff understood this to be a suggestion that she work on some weather processing software to which she had access and which related to the wake data research that she hoped to continue performing under the potential CRADA. Id. Dr. Wang also suggested that Plaintiff create a database and fill it with data. Id. Although Plaintiff had no intention of working on the software or creating a database, she did not respond by saying that she would (or would not) work on the software or the database. Id. Instead, her response to Dr. Wang was: "When should I expect the Statement of Work?" Id.

On April 28, 2011, Plaintiff emailed Dr. Wang, copying Ms. McBride: "How is the draft [SOW] for the CRADA coming along? … Do you have a timeline for an updated SOW? I would like to look it over so that we can be in agreement or make changes before it becomes officially a part of the CRADA." Id. ¶ 36. Ms. McBride replied to both Plaintiff and Dr. Wang. Id. ¶ 37. She wrote: "Let's not get too far ahead. I have nothing yet for the CRADA – no purpose, no tasks, no duration, no 'vet'. And typically the SOW come in draft, I pull some things out and put in the CRADA, and the SOW moves to final…. The SOW I initially get is not the SOW that ends up as an attachment to the CRADA…. Don't forget 'vetting' is one of the most important parts. If the Director and RITA are not on board, then there is no CRADA…. Remember that it takes a minimum of 60-90 days to get online (this includes the 30 days at RITA). The other 30-60 days is

work acceptance, vetting/briefing RITA, drafting the CRADA and SOW, internal coordination of the drafts, negotiation of the documents, obtaining signatures, preparing package for RITA….” Id.

Also on April 28, 2011, Dr. Wang replied to Plaintiff, reiterating the changes to the draft SOW that he had proposed during their meeting on April 1: “[W]hen I first read through the SoW as drafted by you, the thought of having a more rigorous structure within your study came to mind. And as I said in early April during your visit, I think there are a lot of things you can do before waiting for the data, such as prototyping a synthetic dataset as the ground truth data, to test out the behavior of various statistical tests.” Id. ¶ 38. Dr. Wang proposed that Plaintiff develop a particular statistical tool for the SOW. Id. He continued:

> The development and testing of this statistical tool can be written into the SoW, and that would then look like there is a lot more balance and collaboration between Volpe and WPI, and this is just one of the components that I thought of that can enhance the SoW. The SoW doesn’t have enough of the technology flowing back from WPI to Volpe is what I think [Ms. McBride] may detect. … So think about this email a bit, read the papers [technical papers Dr. Wang had sent to Plaintiff], and maybe modify the SoW as you deem fit. I will try to do the same on my end as well as soon as I get a moment here and there. The SoW and the CRADA will take time. But meanwhile, I really do think that you can try to develop these analysis tools on your end while waiting for the real data [*i.e.*, the Volpe wake data to be made available under the potential CRADA]. …

Id.

On May 2, 2011, Plaintiff replied to Dr. Wang that the statistical tool he had suggested “is interesting, something we’ve already discussed here with my advisor and am all on board. …” Id. ¶ 39. Instead of developing the suggested tool and incorporating it into the draft SOW, however, she threw the ball back into Dr. Wang’s court. Id. She wrote: “I had expected that since you have had my initial draft [SOW] since 2/16/2011, that by now we would have at least started to refine it in preparation for [Ms. McBride].” Id.

In early July 2011, Plaintiff left a voicemail for Ms. McBride, asking to set up a meeting regarding the SOW. Id. ¶ 40. On July 6, 2011, Ms. McBride replied by email to Plaintiff and Dr.

Wang, suggesting that the meeting be scheduled for August 4. Id. ¶ 41. Plaintiff replied that

August 4 was fine. Id. ¶ 42. She added: "Frank, have you made progress on the draft [SOW] for

the CRADA? Do you have an updated draft for me to look over and make changes to?" Id.

On July 7, 2011, Dr. Geyer, who had been copied on the emails about a possible meeting

on August 4, emailed his boss, Anne Aylward, asking whether the Director of the Volpe Center,

Robert (Bob) Johns, would be amenable to the potential CRADA. Id. ¶ 43. He wrote:

> A former FCIP employee in T71, Elizabeth Tyree, is a graduate student in
> Physics at WPI. While at Volpe she was a Volpe Fellow, and had submitted a
> thesis proposal to study differences in wake behavior when the prevailing
> crosswind i[s] from over land or water…. To do this, she would need access to
> Volpe wake data. I have suggested a CRADA as the mechanism for providing
> data, as it can include protections on use and further distribution of the data. I
> have spoken with her professor, and he is agreeable to limiting distribution of the
> data.
>
> The potential benefit to Volpe would be better understanding of the effects of the
> wind source.
>
> My understanding is that CRADAs are signed by at least the Director [of Volpe],
> and maybe the Administrator [of RITA]. Do you think that Bob [Johns] would
> be agreeable to sign such an agreement (following Legal's approval)?

Id.

On July 8, 2011, Dr. Wang replied to Plaintiff and Ms. McBride that he, too, would be

available on August 4. Id. ¶ 44. He added: "As [Ms. McBride] had indicated earlier, there are

other front end things we need to work out first, which are the buy-ins of the Volpe Director and

someone at RITA (if not the administrator himself). So we are making steps towards those front

end things. As for the SoW, I provided some feedback but have not put [that] feedback into the

SoW itself." Id. Dr. Wang then listed the three specific feedback items he had previously given to

Plaintiff. Id.

On July 12, 2011, Plaintiff replied to Dr. Wang: "I spoke to my advisor [Professor

Iannacchione] and the deliverables you're asking for in the feedback are in addition to everything

else for my thesis, and would take time." "For planning purposes would you require the deliverables … before the CRADA is in place? Or did you want me to work on it concurrently, in addition to everything else we've previously discussed for the SOW after the CRADA is in place?" Id. ¶ 46. Dr. Wang replied a half-hour later: "What I was suggesting in the feedback actually was my proposal to you and your advisor that those techniques be used as the core of your thesis, especially if you and your advisor believe it is the technically correct approach. And at the same time, it fits what I believe Volpe would want to approach the analysis…. I would propose that those statistical tests be used and written in the SoW in the similar format I have proposed …." Id. ¶ 47.

On July 13, 2011, Plaintiff replied to Dr. Wang. Id. ¶ 49. She acknowledged his feedback to the draft SOW, but accused him of making "no progress" because he had not physically typed his edits into the Word file. Id. She wrote: "Unless you state otherwise, I'll interpret this to mean that you've made no progress on updating the draft [SOW] that I emailed to you on February 16th, 2011. … It is puzzling why you have not just added the points from your feedback into the [SOW] for the CRADA." Id. A few hours later, Dr. Wang replied: "I think there is a lot of misunderstanding on your part regarding what I am proposing. If it helps, we can have a three way phone call between you, your advisor and myself on the technical proposal I am making. As to the SoW, my proposed edits are already sent out to you, and I would consider that a progress to the proposed SoW short of actually cutting and pasting the email text into the [W]ord file. …" Id. ¶ 50.

Plaintiff understood that Dr. Wang wanted to make the SOW more sellable to the Volpe Center because the potential CRADA had to have value not just to WPI but also to the Volpe Center. Id. ¶¶ 51, 54. She also understood that Dr. Wang was making specific proposed changes to the SOW, but she felt it was his responsibility, not hers, to physically type in the edits. Id. ¶¶

45, 48, 49, 52.  She testified:  "If these are changes he wants to see made, he should make them."  Id. ¶ 45.

By July 14, 2011, the relationship between Plaintiff and Dr. Wang had become strained, as illustrated by her email to him:

> I want to be absolutely clear, neither I nor my Advisor are objecting to the technical suggestions being made.  The issues are and have been making progress on the [SOW] so that we can move forward with the CRADA.  The SOW does not need to be hyper detailed.
>
> Please refer to your email dated 4/28/2011.  You stated that you needed to review the SOW again, make changes, and review comments from [Ms. McBride].  I have been waiting for an updated draft SOW document from you.  A reasonable person may conclude to date that you have not made any progress in revising and updating the draft SOW [W]ord document for the CRADA.  Respectfully, I do not feel that I have misunderstood you nor is there an objection to your technical proposal. …
>
> If you feel strongly that your feedback should be considered as edits and therefore progress concerning the [SOW], then please also incorporate your feedback in the form of actual edits within the body of the draft SOW [W]ord document….

Id. ¶ 52.

An hour later Dr. Wang replied:  "I will send you the SoW edits in the form that you want this weekend, although I consider the feedback as su[b]st[a]ntive and you can help me by adding my comments into your draft and have a more updated draft."  Id. ¶ 53.  He added:  "Please note that the added feedback [is] intended to ensure that your thesis effort is on the right track and is able to produce a piece of work that is usable by Volpe, as well as being consistent with the true spirit of the CRADA, which emphasizes sharing resources and analysis efforts.  And from the Volpe legal and administrative perspectives, it is important for me to 'sell it' in terms of 'what does Volpe really get out of the CRADA?'"  Id.  Dr. Wang explained that he wanted his proposed statistical tool written into the draft SOW:  "[T]o formalize the suggested roadmap and to ensure that we have a structure that is more consistent with the spirit of a CRADA, as well as my

personal view on the most efficient way for you to complete your thesis, are these statistical tests that I would like to write into the actual SoW itself. …" Id. Plaintiff's reaction to this email was: "I understood that [Dr. Wang] wanted me to make the changes to the Statement of Work and that he was stating it's because he needed to sell it." Id. ¶ 54.

Later that day, Ms. McBride sent an email reply validating Dr. Wang's concern that the CRADA was not intended merely to enable Plaintiff to complete her master's thesis; it also had to be something that would benefit the Volpe Center. Id. ¶ 55. She wrote: "Frank is correct – he must show benefit to Volpe … and some proposed result seeking (recall the report at the end of the CRADA that assesses if the CRADA met its purpose); the SOW needs to be 'sellable' in that it will align with a DOT goal and is something the Volpe Director and RITA want to do." Id.

Also on July 14, 2011, Dr. Wang learned that he would be out of town for business on August 4. Id. ¶ 56. So he proposed moving the meeting to the week of August 8. Id. Dr. Wang then revised the draft SOW, and emailed it to Plaintiff (and Ms. McBride and Dr. Geyer) on Sunday, July 17, 2011. Id. ¶ 57. He wrote: "Overall I think this current form reads more like a SoW as well as it fits much better with the language a CRADA would need." Id.

Plaintiff did not respond to this email or comment on the revised draft SOW. Id. ¶ 58. Nor did the parties meet in early August, as had been discussed. Id. The SOW was never finalized; Plaintiff never gave Ms. McBride the name of someone who could serve as the CRADA manager for WPI; and the CRADA was never drafted, much less approved. Id. ¶ 59.

Instead, on July 21, 2011, Plaintiff spoke with her advisor at WPI, Professor Iannacchione, who told her that SOWs typically take only a few days in his experience. Id. ¶ 60. Based on that conversation, Plaintiff concluded that the Volpe Center never had any intention of entering into a CRADA with WPI. Id. The reason, she surmised, was her race, gender, and/or national origin. Id.

### 4. **Plaintiff's EEO Complaint**

Plaintiff contacted a Volpe Center EEO counselor on August 10, 2011.  Id. ¶ 61.

Plaintiff's requested remedy was $300,000, plus a new Volpe Center point of contact who would

"be active in advising and mentoring [Plaintiff] for her Masters' thesis; and work with [Plaintiff]

to create a mutually beneficial outcome in implementing the [SOW] which is a primary element of

the CRADA."  Id. ¶ 61.  Dr. Geyer's boss, Anne Aylward (white woman), rejected Plaintiff's

demand and the EEO counselor was unable to resolve Plaintiff's complaint.  Id. ¶ 62.  Therefore,

on November 9, 2011, Plaintiff was given written permission to file an administrative complaint

of discrimination within 15 days.  Id.

Plaintiff filed her administrative complaint with DOT on November 21, 2011.  Id. ¶ 63.

On December 16, 2011, DOT issued a Final Agency Decision rejecting Plaintiff's complaint.  Id. ¶

64.  Plaintiff appealed to the EEOC's Office of Federal Operations on February 1, 2012.  Id. ¶ 65.

The Office of Federal Operations rejected Plaintiff's appeal on June 1, 2012.  Id. ¶ 66.  Plaintiff

timely filed suit on August 28, 2012.  Id. ¶ 67.

### 5. **Plaintiff's Training Program Claim**

When asked about the training program alleged in her Amended Complaint, Plaintiff

testified as follows:

> Q:     … Where was this training program?
>
> A:     At the Volpe Center.
>
> Q:     Okay, and what was it called?
>
> *   *   *
>
> A:     Aside from "training"?  The Center was paying for my education.  The training was basically my training in aircraft wake turbulence and the content related to my thesis.
>
> Q:     What were the hours of the training?
>
> A:     Basically the hours of my employment.

Q: Okay, so the training was synonymous with your employment?

A: Yeah.

Q: That was what you were doing?

A: Yes.

Q: … [A]nd your instructors were Frank [Wang] and Mike [Geyer]?

A: Yes.

Q: They were basically your supervisors? Your supervisors for employment were the same as your instructors for the training, is that fair?

A: Yes.

Id. ¶ 71.

When Plaintiff's employment ended on February 11, 2011, Drs. Geyer and Wang allowed her to keep three things that Plaintiff refers to as training program materials: RUC (Rapid Update Cycle) data, weather data, and RUC processing software. Id. ¶ 72. They gave Plaintiff these materials to help her in connection with her master's thesis – which she hoped to complete with the benefit of additional wake data that would be available once a CRADA was in place. Id. Plaintiff testified that she was given these materials to further her education. Id.

Plaintiff claims that her alleged training program ended when Anne Aylward rejected the settlement that Plaintiff had requested in her complaint to the EEO counselor. Id. ¶ 73. That rejection occurred before November 9, 2011, when the EEO counselor gave Plaintiff a written notice permitting her to file an administrative claim of discrimination. Id. And yet, when Plaintiff filed her administrative claim of discrimination on November 21, 2011, she did not allege discrimination in a post-employment training program. Id. ¶ 74. Further, after DOT issued its Final Agency Decision rejecting Plaintiff's administrative claim and she appealed to the EEOC's Office of Federal Operations ("OFO"), she again neglected to allege discrimination in a post-employment training program. Id. Accordingly, neither the DOT nor the OFO ever had the opportunity to consider a claim of discrimination in a post-employment training program. Id.

### 6. __Alleged Evidence of Discrimination__

Plaintiff was hired by Dr. Geyer and another man.  Id. ¶ 76.  Plaintiff feels that Dr. Geyer discriminated against her based on her gender.  Id. ¶ 77.  She feels that Dr. Wang discriminated against her based on her gender, race, and national origin.  Id.

Plaintiff alleges that the Volpe Center never intended to enter into a CRADA with WPI.  Id. ¶ 78.  When asked to identify all evidence supporting her claim that this alleged decision was based on her race, gender, or national origin, Plaintiff identified only the following four things:  (a) at a meeting in January 2011, when it was explained that someone named Steve Mackey was absent because his baby was sick, someone named Bob Rudis asked, "Where's his wife?"; (b) during Plaintiff's employment, Dr. Wang gave Dr. Geyer negative feedback about her work which she felt was unwarranted and unfair; (c) during her employment Plaintiff's job performance was compared to that of two men, Hadi Wassaf and Mike Bellman, which she felt was unfair because she had different job duties and used different software; and (d) Dr. Geyer changed the performance review of a male colleague who complained, but refused to change Plaintiff's review.  Id.

Plaintiff never heard Dr. Geyer or Dr. Wang make a sexist, anti-woman, or sexually inappropriate comment.  Id. ¶ 79.  She never heard Dr. Wang make a comment that she interpreted as anti-African American or anti-Hispanic or saw him do anything discriminatory.  Id.

### ARGUMENT

For the reasons below, the Defendant is entitled to summary judgment on Plaintiff's two remaining claims:  her CRADA claim and her training program claim.

**1. Defendant Is Entitled to Summary Judgment on Plaintiff's CRADA Claim.**

Plaintiff alleges that, "because of her race, gender, and/or ethnicity the Defendant never had any inten[t]ions of completing the SOW or the CRADA." Am. Comp. (DN 34-1), ¶ 35. This claim fails for three reasons.

First, the claim fails because the proposed CRADA would have been an educational benefit, not an employment benefit, and, as this Court has held, Title VII protects former employees only from "'discriminatory adverse employment actions.'" DN 32 (quoting Gerner v. Cnty of Chesterfield, 674 F.3d 264, 268 (4th Cir. 2012)). Plaintiff admits that, if the CRADA had been finalized and approved, it would have benefited her by enabling her to continue her master's thesis research using wake data available to the Volpe Center. SUMF ¶ 28. She would not have been paid a salary or received any employment benefits. Id. She claims instead that, with the CRADA, "I would have gotten my thesis and I would have been able to graduate." Id. Every case located by the undersigned in which a court has extended Title VII's protection to former employees concerned employment, not educational, benefits. See Hishon v. King & Spalding, 467 U.S. 69, 77 (1984) (pension benefits); Gerner, 674 F.3d at 268 (severance package); EEOC v. Beverage Canners, Inc., 897 F.2d 1067, 1071 (11th Cir. 1990) (laid-off employee's right to be rehired).

Graduate students often present a "unique dual role, as potentially both students and employees." Bucklen v. Rensselaer Polytechnic Inst., 166 F. Supp. 2d 721, 725 (N.D.N.Y. 2001). When a graduate student alleges that he/she has suffered an adverse employment action in violation of Title VII, the reviewing court must determine whether the defendant allegedly "took a discriminatory action with regard to [the plaintiff's] status as an employee," or instead made an academic decision having only "a tangential effect on [the plaintiff's] status as an employee." Id. In Bucklen, a graduate student at Rensselaer Polytechnic Institute ("RPI") who also worked as a

teaching assistant failed his preliminary examination for his doctoral degree three times and was told he had no recourse but to drop out of the program. He sued RPI under Title VII, alleging national origin and gender discrimination. He argued that he was an employee of the university since he received wages and benefits in exchange for working as a teaching assistant. Id. The court held that, assuming arguendo the plaintiff was an employee of the university, he nevertheless had failed to state a claim under Title VII because he "does not allege discrimination in terms or conditions of his employment but rather discrimination against him in his role as a student." Id. at 726; accord, e.g., Stilley v. Univ. of Pittsburgh, 968 F. Supp. 252, 261 (W.D. Pa. 1996) (holding that the following adverse events were not actionable under Title VII because they related to plaintiff's role as a graduate student and not her role as a researcher employed by the defendant university: "denial of the opportunity to use her work on the project [on which she was employed as a researcher] to satisfy her dissertation requirement" and "Plaintiff was forced to start over on her dissertation, and change the subject of her dissertation"); see also Bakhtiari v. Lutz, 507 F.3d 1132, 1137 (8th Cir. 2007) (affirming summary judgment against graduate student/teaching assistant who alleged retaliation under Title VII because his alleged protected activity "pertain[ed] to [his] status as a student, … and not as a TA employed by [the defendant university]"); cf. Mandsager v. Univ. of N.C., 269 F. Supp. 2d 662, 673 (M.D.N.C. 2003) (holding that graduate student, who alleged that professor/supervisor's boorish behavior interfered with her responsibilities as an employed research and teaching assistant, stated a sexual harassment claim under Title VII). Because Plaintiff claims that the non-completion of the potential CRADA between the Volpe Center and WPI denied her an educational benefit rather than an employment benefit, Defendant is entitled to summary judgment on the CRADA claim.

Second, Defendant is entitled to summary judgment on the CRADA claim because Plaintiff's argument that the hypothetical CRADA would have been approved and signed by all

required parties, and that it would have enabled her to complete her master's thesis, is too speculative. When negotiations over the SOW fell apart, there were still far too many unknown variables, as Ms. McBride's April 28, 2011 email made clear. See SUMF ¶ 37. The CRADA was never a sure thing. Id. ¶ 26. As such, it cannot support Plaintiff's claim. E.g., Porter v. Jackson, 668 F. Supp. 2d 222, 232 (D.D.C. 2009) (entering summary judgment against Title VII plaintiff who argued that EPA's three-year delay in applying for a CRADA was discriminatory, in part because "the likelihood that plaintiff would have received a monetary benefit had defendant promptly acted upon her CRADA application [was] completely speculative"); see Bridgeforth v. Jewell, 721 F.3d 661, 664 (D.C. Cir. 2013) (if the alleged harm to the plaintiff employee is too speculative, it does not constitute a materially adverse employment action as a matter of law) (affirming summary judgment against employee in his Title VII action); Aquilino v. Univ. of Kan., 268 F.3d 930, 936 (10th Cir. 2001) ("Speculative harm does not constitute adverse employment action.") (holding that defendant university was entitled to judgment as a matter of law in professor's Title VII case).

Finally, the CRADA claim fails on the merits. The undisputed facts show that both of the accused discriminators, Dr. Geyer and Dr. Wang, made efforts to promote the potential CRADA. Dr. Geyer emailed his boss, Anne Aylward, recommending the potential CRADA and asking whether the Director of the Volpe Center, Bob Johns, would approve it. SUMF ¶ 43. He also spoke with Professor Iannacchione about the potential CRADA. Id. ¶ 43 n.1. Dr. Wang repeatedly emailed Plaintiff (and spoke with her in person on April 1, 2011) regarding the draft SOW, and made substantive suggestions for improving it. Id. ¶¶ 32, 33, 35, 38, 44, 47, 50, 53, 57. Negotiations fell apart because Plaintiff was unhappy with both the substance and the timing of Dr. Wang's proposed changes to the draft SOW. Id. ¶¶ 45, 46, 48, 52. Plaintiff was unhappy even though she acknowledges that Dr. Wang's proposed changes were intended to make the SOW

sellable to the Volpe Center.  Id. ¶ 51.  The undisputed facts establish that it was Plaintiff, not anyone from the Volpe Center, who terminated discussions over the draft SOW and elected not to move forward with the meeting in early August 2011.  Id. ¶ 58.  Indeed, Plaintiff terminated the discussions after Dr. Wang typed in the edits he had repeatedly proposed (because Plaintiff had refused to do so), emailed the revised draft to Plaintiff, and commented that the revised draft "reads more like a SoW" and "fits much better with the language a CRADA would need."  Id. ¶ 57.  Dr. Wang's email indicates he felt the draft SOW was ready, or certainly close to ready, to be presented to Ms. McBride, who could then start writing the CRADA.  There is simply no evidence that Dr. Wang's proposed edits to Plaintiff's draft SOW were bogus (indeed, he took the time to type them in himself on a Sunday), or that Dr. Geyer was bluffing when he called Professor Iannacchione and when he emailed Anne Aylward to ask whether the Director of the Volpe Center would favor the potential CRADA.[2]  Nor is there any evidence that either Dr. Geyer or Dr. Wang harbored a discriminatory animus against Plaintiff or ever made a discriminatory comment.  Id. ¶¶ 79-80.  On the contrary, Drs. Geyer and Wang went out of their way to help Plaintiff when her internship ended.  Later the relationship fell apart when Plaintiff became impatient and frustrated with substantive changes that Dr. Wang proposed for the draft SOW – changes that Dr. Wang had every right to propose and which, at least on their face, were neither bogus nor discriminatory.

For all three of these reasons, Defendant is entitled to summary judgment on Plaintiff's CRADA claim.

---

[2] Plaintiff contends that the length of time she and Dr. Wang were in negotiations over the language of the draft SOW (five months) is evidence of discrimination.  SUMF ¶ 60.  But any delay was at least partly Plaintiff's fault, since she refused to type in the edits Dr. Wang proposed.  Id. ¶¶ 45, 48, 49, 52.  More importantly, five months is not a particularly long time to negotiate a SOW for a CRADA.  Between January 1, 2007 and July 1, 2013, the Volpe Center entered into only two CRADAs.  Id. ¶ 68.  Preparation of the draft SOW for one of the CRADAs took six months, and the other one took more than three years.  Id. ¶¶ 69-70.

## 2. __Defendant Is Entitled to Summary Judgment on Plaintiff's Training Program Claim.__

Plaintiff's training was synonymous with her employment. SUMF ¶ 71. When her employment ended, Drs. Geyer and Wang allowed her to keep three types of training materials: RUC data, weather data, and RUC processing software. Id. ¶ 72. They gave Plaintiff these materials to help her with her master's thesis. Id. The purpose was to further her education. Id. Plaintiff alleges that this "training program" ended when Anne Aylward rejected the settlement Plaintiff had requested in her communications with the EEO counselor. Id. ¶ 73. That rejection occurred on or before November 9, 2011. Id.

Defendant is entitled to summary judgment on this claim for two reasons. First, just like the proposed CRADA, the alleged post-employment "training program" was an educational benefit, not an employment benefit. See, e.g., Bucklen v. Rensselaer Polytechnic Inst., 166 F. Supp. 2d 721, 725 (N.D.N.Y. 2001); Stilley v. Univ. of Pittsburgh, 968 F. Supp. 252, 261 (W.D. Pa. 1996); see also Bakhtiari v. Lutz, 507 F.3d 1132, 1137 (8th Cir. 2007).

Second, Plaintiff failed to exhaust her administrative remedies on this claim. She failed to contact an EEO counselor within 45 days after the alleged training program, and she failed to file a new administrative complaint of discrimination or amend her existing administrative complaint to add this new claim. SUMF ¶ 74. The agency, therefore, was not on notice of a training-program claim and never had the opportunity to investigate it. Indeed, when the Department of Transportation issued its final agency decision denying Plaintiff's administrative complaint, and Plaintiff subsequently appealed to the EEOC's Office of Federal Operations, she still neglected to mention a training claim. Id. Therefore, even the EEOC's Office of Federal Operations – the final administrative reviewer prior to the initiation of a lawsuit – never had the opportunity to consider this claim. Accordingly, Defendant is entitled to summary judgment on this claim. See Velazquez-Ortiz v. Vilsack, 657 F.3d 64, 71 (1st Cir. 2011) ("the scope of the federal court

complaint is constrained by the allegations made in the administrative complaint"); Thornton v. UPS, Inc., 587 F.3d 27, 31 (1st Cir. 2009) ("'The scope of the civil complaint is … limited by the charge filed with the [employing agency] and the investigation which can reasonably be expected to grow out of that charge.'") (quoting Powers v. Grinnell Corp., 915 F.2d 34, 38 (1st Cir. 1990)); Morales-Vallellanes v. Potter, 339 F.3d 9, 18 (1st Cir. 2008); e.g., Beaver v. McHugh, 840 F. Supp. 2d 161, 170 (D.D.C. 2012) (granting Army's motion for summary judgment on plaintiff's Title VII claim alleging discriminatory denial of training because plaintiff's administrative complaint alleged only a discriminatory discharge, and plaintiff failed to amend her administrative complaint to add the training claim at any time before the Army completed its investigation).

## CONCLUSION

For the foregoing reasons, Defendant is entitled to summary judgment on both of Plaintiff's remaining claims.

Respectfully submitted,

RAY H. LAHOOD
Secretary of Transportation

By his attorney,

CARMEN M. ORTIZ
United States Attorney

By: */s/ Christine J. Wichers*
Christine J. Wichers
Assistant U.S. Attorney
One Courthouse Way
Boston, MA 02210
(617) 748-3278
christine.wichers@usdoj.gov

Date:  December 23, 2013

**<u>Certificate of Service</u>**

      I certify that a copy of this document will be sent to the pro se plaintiff by regular mail on December 23, 2013.


                                     */s/ Christine J. Wichers*
                                       Christine J. Wichers